17-1173 C5 Medical Werks v. Ceramtec Good morning, Your Honors, and may it please the Court, Jessica Ellsworth on behalf of Ceramtec. Ceramtec never should have had to defend this case in the District of Colorado. It is a German company that had no employees, no offices, and no clients in Colorado. It engaged in next-to-no contacts with Colorado, and yet when Ceramtec moved to dismiss for lack of personal jurisdiction, the Court decided that those extremely limited contacts were legally sufficient to force Ceramtec to litigate this case in Colorado. The District Court was pretty thorough in its order on that, and then that was the end of the matter. Have you forfeited that issue? We have not, Your Honor. This Court's decision in Brownlow, a 1984 decision, makes clear in footnote one, it specifically states that preserving an argument is preserved on personal jurisdiction so long as it is made in a motion to dismiss. And that case, like this one, was one where the issue came up on appeal after a trial. So under Brownlow, I think there's no question that the issue is properly preserved and is properly raised here. It seems to me there is a forfeiture in one sense, though. If there were evidence developed later on in the proceedings that indicated lack of personal jurisdiction, you can't rely on that. You agree with that, don't you? That's right. Our argument is purely based on the showing that C-5 was required to make at the onset of this case. And that is a prima facie showing, which this Court has described in a case that C-5 points out is a light showing. But in that case itself, the works case, this Court found that the showing was not met. On the other hand, if there were evidence developed later on showing that there were enough contacts for personal jurisdiction, we could refer to that to sustain the ruling on your motion. Could we not? No, you can't, Your Honor. And that's because the question is whether at the time the case was filed, there was – C-5 carried its burden to show that personal jurisdiction was proper. I'll also note that there was no evidence later developed that supports C-5's position. They point to a number of things in their brief that post-state the filing of the complaint. But actions that post-state the filing of the complaint aren't relevant to whether personal jurisdiction – Not actions of SRAMTAC post-stating it, but more evidence of the earlier action. I'm thinking – I think this is how we handle suppression motions. If perhaps the evidence that the suppression motion might sustain the motion, but the district court ruled otherwise, evidence at trial could be used to support the denial of the motion to suppress. And I was assuming that would be similar here, but you're saying there was no other evidence? There wasn't any. The sole contact that they have identified in their response brief that occurred prior to the filing of the complaint that was developed as the case proceeded was a single dinner that a single surgeon attended. And C-5 has never asserted that its injury grew out of that single dinner in any way. So that really leaves us with the question of whether these contacts were legally sufficient. And this is – I think one of the reasons this didn't come up at trial and this wasn't pursued further by SRAMTAC is because it was a legal ruling. There was no factual dispute at the motion-to-dismiss stage about what these contacts were. The only question was the legal sufficiency. And once the judge had ruled on the legal sufficiency of those particular contacts, there was no – nothing to be – to be further aired on the issue. And those contacts that the district court relied on were three medical conferences. Can I just follow up on that? Because I think in the typical case you would have a medical device that comes to Colorado and injures someone. And you can see the connection between maybe the contacts of marketing and selling the product in Colorado and the use and the injury. And that did not happen here, you're going to tell us, correct. But what would contact look like in a case like yours that would be sufficient? So I think the Campbell Pet case from the Federal Circuit is a good example of that. That is a case in which the patent holder actually executed a seizure, had a third party execute a seizure at a trade show that was occurring in the forum. So you would have to actually have something like that? There would have to be some sort of enforcement activity in the forum that was somehow targeted at C5. So it could have – if the seizure that occurred in France under French law, authorized by a French court, had instead occurred at the Broadmoor, it would be a different case. But of course all that's alleged to have happened at the Broadmoor is that Ceramtech had a display where it showed what its product was and it gave away things like pink golf balls and pink tote bags. That is for many reasons not sufficient to sustain a finding of personal jurisdiction. Not the least of which, these were random, fortuitous contacts. C5's alleged injury would have been no different had they not occurred. And I guess just following up on that, you could have had a seizure anywhere too, right? I mean that's the problem here is that isn't it true that a seizure could have followed in any location of a conference? Well, it would have to – it would depend entirely on the trademark rights at issue. So the seizure that occurred in France was a seizure that was executed by a French court based on French trademark rights. So whether or not something like that could have or would have happened in the United States or in Colorado, there's no evidence – there's no showing, there's no prima facie showing that that had happened. The sole thing that C5 pointed to that related at all to enforcement was the seizure in Paris, which clearly is outside the bounds of personal jurisdiction for purposes of this Court's analysis. And I'll note they rely most heavily on the Dudnikoff case and the Calder case. But frankly, their reading of Dudnikoff and Calder can't be squared with the Supreme Court's decision in Walden, which this Court has twice recognized since then limits the ability of someone to invoke an effect on them in the jurisdiction caused by conduct that occurred outside the jurisdiction. And that's what the – that's exactly what the French seizure was here. In Dudnikoff, what if eBay headquarters were in Paris? I think the answer, Your Honor, is that in Walden, what the Court said – You're saying – well, do you think Dudnikoff was wrongly decided is what you're saying? I think Dudnikoff may have been a fair reading of Calder and some other Supreme Court cases at the time, but Walden has clearly narrowed the ability to rely on effect – an effect within the jurisdiction  Are you saying that if we followed Dudnikoff, you would lose on personal jurisdiction? No, I'm not saying that. How do you distinguish Dudnikoff, then? So one of the things that's different about Dudnikoff is the contact there with eBay in California was one that asserted U.S. copyright – U.S. copyright rights. Here, the seizure involved French trademark rights. So you have a distinction from the get-go in the type of rights that were being asserted. There is nothing that shows that Ceram-Tex took any enforcement action about its U.S. trade dress rights in Colorado or anywhere else within the United States. So this Court's Rockwood decision in 2014, which I might note Judge Gorsuch – then-Judge Gorsuch was on the panel, and of course, he – he authored the Dudnikoff decision. He agreed in Rockwood with the panel's holding that Walden teaches that personal jurisdiction cannot be based on interacting with a plaintiff known to bear a strong connection to the forum state. And Ansores, which this Court decided in 2016, reaches the same conclusion. And in that case, the plaintiff, like C-5, had relied primarily on Dudnikoff and Calder, and this Court explained why Walden controlled and those cases did not. So I would suggest to this Court that simply reading Walden, Rockwood, and Ansores leaves C-5 without any real argument that they were affected by the French seizure. That leaves them with the three medical conferences at Vail – the Vail Cascade and the Broadmoor. These conferences, as I mentioned, were fortuitously connected to Colorado. Ceram-Tex had nothing to do with where the conference sites were. And more importantly, C-5's alleged injury was not based on and would have been the same had Ceram-Tex never attended those three conferences. The Kunzel case, which this Court decided in 1996, and the Mong case from 2012, I think leave no question that the query this Court asked is whether C-5 would have suffered the same injury if Ceram-Tex had not attended the conferences. And the answer is clearly yes. The suit wasn't brought to stop Ceram-Tex from going to a conference and giving out pink golf balls. This was brought to stop them from enforcing trade dress rights. And there's nothing about the conferences that relates to enforcement. In the analogous patent case, the Federal Circuit has repeatedly held that only enforcement activities count, and that's because promotion is really just about a party's own commercialization efforts. And whether you have a patent or a trademark or a trade dress right, commercializing your own product does not cause injury to someone else. It's only when a company goes the next step and starts trying to exclude someone else from the market to enforce those rights that there is an injury. So for all of those reasons, coupled with the fact that the reasonableness inquiry of the Due Process Clause demands heightened care for foreign defendants, we think that Ceram-Tex clearly has the better of the argument that there was not a legally sufficient basis to require it to litigate this case in Colorado. And I'll note that the Benton decision from 2004 in this Court specifically held that when there is a close question about whether minimum contacts exist, it doesn't take much to defeat personal jurisdiction with the reasonableness inquiry. We think for all of those reasons that's the case here. Let me ask one question on personal jurisdiction, though. If we're supposed to be particularly sensitive to a foreign company, how do you factor in the fact that Ceram-Tex brought its own suit in the United States? Your Honor, I don't think that that has any bearing on the two questions. They really ask and go to different issues. One is whether it's reasonable to force Ceram-Tex to come to Colorado, to the United States, to defend this trade dress suit. The other is whether there might be jurisdiction somewhere else. And under Rule 4K2- Why is it unfair to bring suit against them in the United States when they bring suit in the United States themselves? So that suit was brought secondarily. It was brought after the suit in Colorado was filed. And if anything, if C-5 was concerned about this issue, they could have allowed the suit in Delaware to go forward, which would have eliminated this whole personal jurisdiction question from being at play. But they, of course, chose not to do that. And so- What happened to that other suit? It was dismissed after the District of Colorado concluded the case in Colorado would go forward. If I could briefly address the merits arguments in case the Court reaches them, and then I do want to save a little bit of time for rebuttal, so I will be brief. The functionality inquiry that the Supreme Court has set forth in the traffics case is designed to ensure that there is sufficient room for both patents and trademarks and trade dress to exist. There's a balancing. So the functionality analysis asks whether the feature claimed in the trade dress is essential to the use or purpose or affects the cost or quality of the patented item. Here, the District Court conflated chromium with the color pink, and it conflated sintered moldings with ceramic hip implants. There is no question, and C-5 acknowledges that ceramics made under this patent, which is really just about a complex scientific composition from multiple elements, whether that composition is the same as a pink ceramic hip implant is simply not addressed by the 816 patent, which the Court found essentially got dispositive weight in deciding whether the trade dress was precluded and functionality existed. The specific pink color comes from, is it .33 percent chromium? The specific pink color comes from the unique combination of ingredients that are used in BioLux Delta, which do include .33 percent chromium. There's nothing magic assigned to the .33 percent chromium anywhere in the patent. There's nothing about the color pink that's mentioned. Is there any evidence that .33 percent chromium has some functional properties different from .25 percent chromium? No, Your Honor, there's not. The patent, in fact, describes the whole range from .1 to 5 percent as having a uniform benefit. So there's nothing that is specific to .33 percent. And C-5 zone conduct in this case, in which it really reverse engineered to try and figure out what the percentage was so that it could use chromium essentially as a colorant to get to the same color product, shows that even C-5 didn't assign a functional value to the amount of chromium. Just briefly to note that the estoppel holding that the Court reached below offers no basis. It doesn't even explain what sort of estoppel it's imposing, and it too is contrary to traffics, which of course held that there is room for there to be both patents and trade drafts and that the two doctrines can coexist. And with that, I will save the very limited seconds I have left for my rebuttal. Thank you, Your Honors. Thank you, Counsel. Good morning. May it please the Court. My name is Peter Vogel. I'm here today on behalf of Appalachia C-5 Medical Works and CoorsTek Medical. Your Honors, the District Court understood what this case was about. This case was about CeramTek taking their 20-year-old patent that they had taken full advantage of, had an opportunity to take every dollar that they could possibly take out of the invention that they recited in that patent, take that 20-year-old patent, and as it was about to expire, decided to convert the patent rights, those functional rights that they had ascribed to the use of chromium, creating hardness in these hip balls, to try to make trademark rights out of that. They tried to convert their patent rights into trademark rights. And indeed, the Court found that those trademark rights were based on the functional attributes that chromium always applies, that chromium always applies to ceramic. If you use within the range as described in the patent, a .33 percent, the .33 percent that the Court mentions is within the range specifically identified in the patent. Couldn't your client have obtained all the functional benefits of the patented concept without using .33 percent chromium? Could they have used .10 percent chromium? It wouldn't have been the same color. Right. And it would have the same functionality as .33 percent? No, it wouldn't, Your Honor. Well, as far as the patent is concerned, it does, right? No, it doesn't. The range in the patent describes various functionalities that are achieved through using different percentages of chromium in relation to zirconium. If you change the amount of chromium, you change the amount of hardness in the material. Not all hardness, not anything above or below. It's in the patent? Yes, it's in the patent. And specifically, the hardness in the patent, the hardness of chromium created by chromium is optimal if used at .33 for hips. Well, that's not stated in the patent, is it? No, but it's what Ceramtech taught the industry. Because of their 20 years of exclusivity, they went out and talked to the FDA. They specifically always referred to that chromium makes it harder, makes it pink. So they conflated and associated. Did they ever talk about .33 percent? Yes. They provided that figure to the FDA. So they specifically identified .33. It was not a secret that they were using .33. And so when this patent expired, my client, knowing that that patent was now in the public domain, practiced what was taught in the patent. And the use of chromium was the difference maker. They specifically, in getting that patent, specifically told the patent office that for the first time ever, they had achieved hardness factors through a very small amount of chromium within the range. That 20 to 1 to 1,000 to 1, anything within that range created a particular effect. And what happened was is that when they taught the industry, the ceramic hip ball industry, that this particular amount, this .33 percent was the optimal amount, when the patent expired, any range described in the patent was available to anyone to use. So there would be no reason, Your Honors, that we would have to be limited to a lesser amount or a greater amount than .33. Once a patent expires, the entire teachings within that patent become in the public domain. To do otherwise would create complete havoc subsequently. Let's assume, contrary to what you're saying, that all the patents said and all that the evidence showed is that if you use chromium within that range, you get a harder product. Then would their specific percentage that gives this particular color have been trademarkable? Because you could get the same functionality without getting that color? No, Your Honor, because any functionality described in the patent, no matter what color, whether it created pink, white, or red. What purpose is served by doing that? If any competitor could get the same functionality without copying, as was intentionally done by your client, I don't think that's in dispute. Why does that help competition? Doesn't that harm competition? No, it doesn't. If you could get the same functionality without that color. But you can't, Your Honor. What you're indicating, if you were to give them the color, you're giving them the functionality. No, no, no. Well, no, because say you could have done it with a slightly different shade of pink or white or whatever or purple and had the identical functionality. Why would that not be trademarkable? Why would not their specific color, their specific percentage be? You're saying that's contrary to fact. Sure. But I'm asking a legal question. Sure. So in trademark law, Your Honor, functional attributes are not subject of trademark rights. That's the subject of patents. So something that is functional is expressly precluded from becoming a patent or becoming a trademark. And what happened in this case is they tried to get their pink registered as a trademark. And the trademark office said, no, because the reason it can't be trademarked is because you have not convinced us that you're using it as a trademark. It has not acquired distinctiveness. It has not specifically risen to a level where consumers understand, the relevant consumer, doctors and OEMs, understand pink to be a trademark. So what they did is the trademark office said, you need to go out and you need to promote and you need to market the fact that the pink is a trademark. So what did they do? They came to Colorado. They appeared at these shows. Let me ask you this question. Say we disagree with you on the legal proposition you're saying that even if there's no difference in functionality between .33% and .02% or whatever, and if there's no difference in functionality, then it is trademarkable. Isn't that, isn't the point you're just making, the basis of the district court's opinion? It seemed to adopt that view rather than go into any discussion of .33% is specifically a specific merit. Am I correct? Yes. Yes, Your Honor, you are correct. So if we disagreed with your broad legal proposition, would we not have to remand for the judge to make a determination of whether .33% has specific functionality? No. If we reject your general. I understand. I understand. The court had 11 days and 23 witnesses of testimony, 23 witnesses. I'm going to say three-quarters of those witnesses spoke directly to the issue of chromium and functionality. The other side conceded that the amount of chromium that they describe in the patent, claim three of the patent, covers this particular hip ball. So specifically what the court found is that their attempts to claim that there were additional ranges that we could have used were not. Legally relevant. Affirmed by the court. Pardon me? What the judge said is that's legally irrelevant. Correct. It is legally irrelevant because there. But if we disagree with that. But maybe you would accept your argument that .33% has specific merit. It's more meritorious than any other percentage. Well. The question I was having is if that's how we ended up, would we have to remand? No, I don't think so, Your Honor, because I think what is specific here is that the court did include in his decision that anything within the range. He looked at that range. He had witnesses. He had documents. He had the testimony of their lead scientist. He had experts. That range includes the .33. So we believe, Your Honor, and I think the record reflects, that he did consider all the possibilities within that range, including .33, and felt that that .33 was indeed, as described by Cerantech, was created as a functional attribute. It created hardness. It bettered this particular ceramic for this particular application. And that, Your Honor, is all that we need to show. We need to just, under traffics, show that the essential use or purpose of this particular ingredient, chromium, was to create a functional purpose. It made it harder. We've challenged them. They've never said it's incidental, arbitrary, or ornamental, which is the standard under traffics. If it were incidental, ornamental, or arbitrary, they would have said that. They got this patent knowing full well that they were going to get the exclusivity because of the function that chromium had. They never started this with, oh, we'll make it a trademark. They could have done that, but they made a patent bargain. They chose to get the 20 years of exclusivity through the patent. They could have tried to get a trademark at the outset. They didn't try that. It was only in the facts and the record reflect that it was only at the point in time that their patent was about to expire that they decided, oh, well, we need to find another way to extend our exclusivity. And it's at that point that they tried to get the trademark office to give them an exclusive trademark. And they failed in doing that. You're down to 430. Can you speak to the jurisdiction? Sure. Sure, absolutely. Your Honor, it's clear in our declaration at the early start of this case, at the beginning of the case, we set forth in A-159 at paragraph 17, Ceramtech has promoted and marketed its Violex Delta product at numerous trade shows and other events in Colorado. And in the next paragraph, at paragraph 18, first sentence, Ceramtech has used its promotional efforts at trade shows and industry events in its attempt to promote its purported rights. These are the very rights that C-5 sought to cancel in this case. Last quote I'll give you, Your Honor, and then I'll speak to your question specifically, is that at A-181, the full paragraph in the middle of the page, Ceramtech's, this is the court speaking now, Ceramtech sent agents to Colorado repeatedly to promote its products, and Ceramtech's promotion of those products is a justification for its trademark application. And at that, at the end of the paragraph, two-thirds of the way down, the court says, the fact that Ceramtech has actively sought to promote its brand and its unique pink color, the precise subject of its disputed trademark in Colorado on at least three occasions, establishes purposeful direction. So the events that occurred here in Colorado were events that the trademark office had suggested to Ceramtech. Those types of events are the very type of events that are used by these types of manufacturers to promote and to reinforce their trademarks to their customers. So they showed their product. They talked to doctors. They talked to OEMs. They weren't a passive participant. They weren't sitting in an audience. They were sponsors for these events. They sponsored these events, which gave them greater access to the attendees, to the doctors, to the very OEMs that they were selling to. So to suggest that they were just randomly in Colorado at these events, the facts don't bear that out. Did they have any role in selecting the location of the event? I don't believe they had a role in selecting the location, Your Honor, but I don't believe that's a priority here because, in fact, they came to the court. They invoked Colorado if they had nothing to do with where this event was being held. Well, Your Honor, they invoked Colorado by coming into Colorado specifically to participate in these marketing and promotion events. So they specifically intended to make the choice. They intentionally came into Colorado to purposely establish trademark rights and then purposely enforce those trademark rights and enforce those trademark rights they did by threatening litigation here and by seizing in Paris. Couldn't those efforts, though, have occurred anywhere in the United States? I mean, that's your opposing counsel's argument, right? They could have had, oh, my gosh, a conference in Tennessee, and they promoted their products in Tennessee, and then there'd be jurisdiction in Tennessee, not in Colorado. It's certainly possible, Your Honor, that there might have been other venues where they may have just shown their product, but the fact of the matter is they came into Colorado specifically to market and promote their product. Whether they did that in other states, I don't know. We never got to that at trial because we never proceeded with the discussion on personal jurisdiction at trial. But I guess your position is any promotion would be sufficient to invoke the State's jurisdiction. Certainly, yes. And you reject their argument that you have to have at least some enforcement activity in the forum state. Right. And the reason I know that, Your Honor, I know what they intended to do because their counterclaims that they filed in this case specifically say that they have established trademark rights in the State of Colorado, and they're asserting the goodwill that they established in those counterclaims. Counterclaims 3, 4, and 5 are based on Colorado State claims, and you can only make those claims if you're asserting that you have trademark rights in Colorado. They asserted those claims, and that, Your Honor, supports our initial pleading at our initial pleading stage, all the claims that we made that they were actively trying to establish trademark rights and to enforce those rights in Colorado. Subsequently, their counterclaims proved our point. What about forfeiture? There's going to be time to pursue this. These are two tough, interesting questions, so don't be – I don't want you to drag things on. Understood. We're going to take some time to explore this. Sure. Go ahead. Well, I saw your clock was at two seconds. Sorry about that, yeah. I thought we could get a question and answer in two seconds. But what about the forfeiture issue? Are you asserting that they forfeited by not bringing it up at trial? And if so, can you concisely say why? Yeah, yeah. And respond to counsel. Sure, Your Honor. The fact of the matter is, yes, they did file their 12B motion. And, you know, they – in the normal course, they're not required to do much else. But in this case, they specifically sandbagged. And specifically what they did is we believe that the fact that the counterclaims that they ultimately asserted led us, and I frankly believe Judge Jackson, to believe that they had no longer contesting personal jurisdiction because they affirmatively claimed trademark rights in the state of Colorado, asserting trademark infringement, unfair competition, deceptive trade practices under the Colorado statute. There would be no reason for Judge Jackson or we to believe that they were still contesting the personal jurisdiction. They also pulled a witness who was their lead affiant in their 12B motion on the issue of jurisdiction. They pulled him at trial. So we never had an opportunity, to the extent that that issue was still present in the case, to cross-examine that witness. So those two activities – and they never made any continuing objections at any point, either at the end of the case, during the middle of the case. So it wasn't until they decided that they didn't like the result in the case that they decided maybe personal jurisdiction would be a Hail Mary that they could use in this court to try to undo the decision that Judge Jackson rendered. Did you rely at all on their sandbagging, as you say? Well, certainly, Your Honor. I mean, had we known that they were going to present the issue of personal jurisdiction, we would have had other evidence that we could have put into the case that would have shown that they had established more contacts with Colorado. But we believed that the prime facie case that we established was sufficient. Judge Jackson believed it was sufficient. And then the counterclaim certainly, you know, led us down the path in believing that they were willing to litigate the case and live with the result. And here, the result did not go the way they wanted. And now we're, before you, talking about personal jurisdiction for the first time. Thank you. Thank you. Thank you. Give her $250,000, please. Add the two seconds to the $248,000. Thank you, Your Honor. Judge Hartz, I think you had it exactly right when you asked if C-5 could have used a different percent and gotten all the functional benefits of the patent. The answer to that is yes. And the Bacare-Lades case from the Fourth Circuit is the case that I would suggest this Court look to to see that Traf-Ex does not apply in those circumstances. Was there testimony at trial to that effect? There was testimony at trial about the fact that the patent, that the patented claims could result in all sorts of colors of ceramics, from off-white to pink to red to purple to yellow to gray to black, and that there was no difference assigned among those ratios, that the claim was just that the use of the ratio was what got you the benefit. The second point I'd make is that the FDA submissions that my opposing counsel mentioned, nothing in them ever identified .33 percent as functional. There is no document they can point to in the record where C-5 has ever said that the – excuse me, Ceram Tech has said that the .33 percent is somehow the reason the device works, as opposed to any other percentage that fell within the patent. The problem here was that the district court refused to engage with the fact that there were multiple colors and there were ranges claimed in this patent. I'd suggest the Court look at the patent, which is at A1144 to A1155. You will see there's nothing in there that describes any unique benefit or says the reason a hip implant component will work is the use of .33 percent chromium. And I would also note that C-5 doesn't even practice this patent. So the notion that somehow the patent precluded them from entering the market at some point with their product is just wrong. They're not practicing the patent. Well, the district court certainly heard the testimony of Dr. Koontz and was unpersuaded that that was good evidence. What do we do with that? Well, Your Honor, I think that's a tricky question, and it's the reason that we have focused on the legal error and how the court applied traffic. One of the two reasons that the district court gives for not crediting that testimony is that he sees it as inconsistent with the patent, which he is giving controlling weight to. So once you correct the traffic error, I think that the assertions about Mr. Koontz's testimony, Dr. Koontz's testimony, will flow from that decision. Judge, you had it, I think, exactly right as well. When you asked if enforcement and promotion activities could be conflated, would that mean that defendants would be subject to trade dress litigation nationwide any time a product is promoted or used nationwide? The Supreme Court has cast doubt on the fact that specific jurisdiction is proper in all 50 states under any particular conduct, and I think for all the reasons in the patent context that the Federal Circuit has already dealt with in careful detail, there is no reason that it makes any sense to conflate enforcement and promotion, particularly given the counsel case from this Court that notes as much. Finally, I just want to explain that the functionality and estoppel rulings that the district court erred in making apply to all of the claims and counterclaims that were asserted in this case. The counterclaims that were brought by Ceram Tech were mandatory counterclaims, so there's nothing that can be read into the assertion of those counterclaims after the personal jurisdiction ruling had been made in this case. Thank you. Thank you, Your Honor. Thank you very much, counsel. That was interesting. Case is submitted and counsel be excused.